THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ALI MADERA, Also Known as ALBERTO RIVERA, Respondent.

First Department, April 20, 1993

## APPEARANCES OF COUNSEL

*Adrienne Brewington* of counsel, Bronx *(Peter D. Coddington* with her on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for appellant.

*Steven J. Miraglia* of counsel, New York City *(Philip L. Weinstein,* attorney), for respondent.

## OPINION OF THE COURT

MURPHY, P. J.

In the early morning hours of December 1, 1990, two police officers received a radio report, based on anonymously provided information, that there had been a fight at 1411 Grand Concourse and that one of those present at the site of the altercation had a knife. Minimal descriptions were provided of two persons: one of them reportedly wore a red jacket and the other a dark jacket with a white stripe.

Shortly after arriving at 1411 Grand Concourse, the responding officers were called to the aid of another officer at a different location. Upon their return a few minutes later to the scene of the incident described in the radio run, the officers observed three men, none of whom wore items of clothing remotely resembling those mentioned over the radio. No one was seen with a knife and there was no sign of any disturbance. Nevertheless, the officers approached the men and, as they did so, one of the men, the defendant, ran away. The officers pursued him on foot and were assisted by several police cars. Less than a minute after the initiation of the chase, the defendant discarded a gun. Seconds later he was apprehended and eventually charged with criminal possession of a weapon in the third degree.

Ruling upon the defendant's ensuing motion to suppress the gun, the motion court held that the police action had not been justified since the officers had, at most, a predicate for inquiry, one insufficient to sustain the significantly greater intrusion constituted by the officers' pursuit of the defendant. The court also found that the defendant's discard of the gun some 30 seconds into the chase had been a spontaneous reaction to the illegal police conduct. The suppression motion was accordingly granted. We now affirm.

There can be no doubt that the motion court's determination to suppress was compelled by clear and well-established law governing police-citizen encounters. It is undisputed that

upon arriving at the scene of the anonymously reported incident, the police observed nothing indicative of criminal activity, much less of the particular activity or persons described to them over the radio. As they approached the defendant, then, the police had absolutely no reason to believe that he or the other men with whom he was standing had been involved in the commission of any crime. Under the circumstances, the officers' decision to pursue the defendant can have been based upon nothing more than the fact that he apparently chose to avoid them. The defendant, however, like any other citizen, "had a right to refuse to respond to police inquiry and his flight when the officers approached could not, in and of itself, create a reasonable suspicion of criminal activity" *(People v Martinez,* 80 NY2d 444, 448). This being the case, it is clear beyond peradventure that there existed no predicate for the pursuit of the defendant.

Police pursuit, of course, constitutes a significant interference with the pursued person's freedom of movement akin to that occurring in the case of a detentive stop and, accordingly, is only permitted upon such grounds as would render a detentive stop legal *(supra,* at 447). Those grounds should, at least in theory, hardly be a matter for judicial debate, for it has long been established both as a matter of constitutional and statutory law that no one may be subjected to a detentive stop unless there exist, at a minimum, circumstances which would in an ordinarily cautious person justify a reasonable suspicion that the person to be detained had committed, was committing, or was about to commit a crime *(see, Terry v Ohio,* 392 US 1; *People v Cantor,* 36 NY2d 106, 112-113; *People v Martinez, supra,* at 447; CPL 140.50), circumstances which in the present case were simply not present. As noted, apart from the defendant's flight, the police had not the slightest indication that he had committed any illegal act, and as the Court of Appeals has so recently reaffirmed, flight alone cannot, as a matter of law, constitute a sufficient basis for a detentive stop or for the functionally equivalent intrusion constituted by pursuit.

Contrary to what I understand to be the relevant contention of the dissent, the very lately reiterated law governing this case is not at all unclear, and when that law is applied to the facts as found by the motion court, the result we now affirm could not be more obviously required. It is a result which, it may be noted, would follow even under the "broader principles" articulated in *People v De Bour* (40 NY2d 210) to which

the dissent urges that we "return." For those broad principles require both that police action be justified at its inception *and* that the action be "reasonably related in scope to the circumstances which rendered its initiation permissible" *(supra,* at 215). Regardless of whether the police action here at issue was justified at its inception, it is plain that the subsequent pursuit of the defendant was not reasonably related in scope to the circumstances upon which it was premised. The police had, at most, some basis to approach the defendant for information; they had no reason to suspect him of criminal involvement and, accordingly, no basis to pursue or detain him.

Obviously, the broad principles of *De Bour (supra)* do not stand for the proposition apparently embraced by the dissent that whenever police officers may approach a person they may pursue him or her simply because their inquiry is avoided. Rather, what *De Bour* stands for in its general and, indeed, specific, sense is that police action must be justified from its inception, and at any subsequent juncture, by a sufficient factual predicate, even when the police conduct involved does not amount to a seizure within the meaning of the Fourth Amendment. Indeed, as should have been evident from the decision itself and, in any case, has since been made explicit, the principle concern in *De Bour* was to assure that all phases of police-citizen encounters would be subject to judicial scrutiny, not just those involving the extreme limitation of personal freedom occurring in the case of a formal seizure. It has not yet been a year since the Court of Appeals unanimously reaffirmed *De Bour,* observing in the course of doing so that the decision "reflected our judgment that encounters that fall short of Fourth Amendment seizures still implicate the privacy interests of all citizens and that the spirit underlying those words required the adoption of a State common-law method to protect the individual from arbitrary or intimidating police conduct" *(People v Hollman,* 79 NY2d 181, 195). Unfortunately, *De Bour's* central and recently reiterated concern that individual privacy not be unduly compromised by official overreaching at any point in police-civilian encounters, even at the most preliminary informational stage, simply cannot be reconciled with the approach advocated by the dissenter. The dissenter states that "where an officer has a justifiable, and thereby I mean articulable and credible, reason for approaching a civilian, to request information, investigate the report of a crime or investigate suspicious behavior, the civilian's flight in the face of a nonthreatening approach

by a police officer is the escalating factor which justifies the officer's pursuit." This is not at all different from saying that when an officer may for whatever reason approach a person he may also pursue and detain that person. This does not represent a "return" to the "general principles" of *De Bour* but a completely new and conflicting rule, the proposal of which must from a jurisprudential perspective be regarded as remarkable, coming as it does within months of the Court of Appeals reaffirmance of *De Bour* and virtually on the heels of the Court of Appeals restatement in the clearest possible terms that nothing less than a founded suspicion of a person's involvement in criminal activity will justify police pursuit *(People v Martinez, supra,* at 447).

The suggestion that longstanding and recently unanimously reaffirmed law be rejected is not simply extraordinary from a precedential standpoint, but profoundly troublesome from a legal one, since the proposed new rule is, to say the least, of doubtful constitutional validity. The dissenter's notion that the police may pursue and seize whomever they may approach, would necessarily validate seizures in situations such as the one at bar in which although there is perhaps some basis for inquiry, there exists no reason to suspect a particular person of crime, indeed, in which it has not even been reliably ascertained that any crime has been committed. To permit the seizure of a person, simply because that person asserts his or her undoubted right to be left alone is not merely violative of this State's common law, but its statutes, its Constitution, and, indeed, the Federal Constitution. Under all of these authorities the absolute minimum predicate required to support the seizure of a civilian is a reasonable suspicion that the person to be seized has committed or is about to commit a crime; it is not, as the dissenter would hold, invariably sufficient that police inquiry however legitimate has been avoided.

While I share the dissenter's concern for consistent adjudication, consistency, assuming that it would be more nearly achieved by application of the dissenter's formulation, is not a balm for unconstitutionality. There is no jurisprudential virtue to consistency which accommodates illegality. It is, moreover, not a bit puzzling to encounter such pronounced concern for consistency in an opinion the principal thrust of which is to urge a rather marked discontinuity in the law. If clarity and consistency are of real concern, and indeed they must be, the law ought to be applied as it is, not as it might be if individual judicial preferences were accommodated. While the

four-tiered approach for evaluating police-civilian encounters first set forth in *De Bour (supra)* may in some respects have required clarification, clarification has been provided *(see, People v Hollman,* 79 NY2d 181, 188-192, *supra).* And, while *People v Howard* (50 NY2d 583) may have left some question as to the minimum predicate for police pursuit, that too has been clarified *(People v Martinez, supra,* at 447-448). In light of the most recent explication of these precedents, there can no longer be any doubt as to their continued vitality or precise significance; nor can there be any excuse for failing at least to attempt to apply them in a consistent and evenhanded way, especially where, as here, the result they require is unmistakeably clear. Far from promoting consistency, the result and consequent holding urged by the dissent would only give new life to precisely the sort of vagaries responsible for the inconsistency it finds so troubling. Contrary to the impression the dissent would convey, it is not because courts have been too assiduous in their analysis of police-civilian encounters that cases in the subject area of the law have grown difficult to reconcile, but rather because the analysis which the law has required has been occasionally eschewed in favor of the sort of appeal made by the dissent to amorphous and ultimately highly subjective notions of what would be reasonable police conduct under given circumstances. Doubtless, from the standpoint of effective law enforcement, the frustration of legitimate police inquiry will always seem unreasonable and, to use the dissent's adjective, impractical. From the standpoint of the interests lying at the heart of the Fourth and Fifth Amendments, however, limitations upon the power of the State through its police to pursue even appropriate inquiry are not only reasonable but necessary. The very basic right of an individual to remain free of governmental intrusion and coercion would amount to very little if the police were permitted to stop, detain and question someone simply because they had some justifiable desire for additional information. What the dissent quite evidently fails to appreciate is that there is a fundamental difference between the right of an officer to inquire and the right of an officer to pursue and seize *(see, e.g., People v May,* 81 NY2d 725). The former may be premised on what the officer under the circumstances may legitimately seek to know, while the latter must be premised upon what the officer does know, namely, that there are reasons to suspect a particular individual of criminal involvement. Although an officer is entitled to inquire, he is not in our system

of justice entitled to a response and may not pursue or seize a person simply because a response to his inquiry has not been forthcoming *(see, People v Howard,* 50 NY2d 583, *supra; People v Martinez, supra,* at 448). This is not to say that the frustration of legitimate inquiry may not be taken into account in assessing the adequacy of the predicate for pursuit or seizure, only that it cannot itself suffice. Contrary to the suggestion of the dissent, pursuit and its intended outcome, seizure, are never justified simply to continue investigation or inquiry. If the refusal to respond in combination with other relevant circumstances gives rise to a reasonable suspicion that a person has committed or is about to commit a crime, then and then only can a person be kept from going about his or her business; a police officer's mere curiosity, even if legitimately piqued, cannot suffice as a basis for seizure and interrogation in a society which places any significant value on personal privacy and any commensurately meaningful limitation on the coercive power of the State.

Accordingly the order of the Supreme Court, Bronx County (Phylis Skloot Bamberger, J.), entered February 7, 1992, granting the defendant's motion to suppress physical evidence, should be affirmed.

Ross, J. (dissenting). I cannot agree with the majority's decision to affirm the suppression of the weapon discarded by the defendant during his flight from the arresting officers. Such affirmance in this case would perpetuate the confusing analysis of police-civilian encounters, in which the individual flees upon a justified approach by police officers, which the courts have been constrained to engage in since *People v Howard* (50 NY2d 583, *cert denied* 449 US 1023; *see, People v Holmes,* 181 AD2d 27; *People v Mitchell,* 185 AD2d 163; *People v Rodriguez,* 178 AD2d 381). The notion that police officers cannot legally pursue an individual, who flees upon their justified approach, unless there is an additional overt indication of criminality ignores the reality of street encounters and "serves merely to deal another serious and unjustifiable blow to effective law enforcement" *(People v Howard,* 50 NY2d 583, 594 [dissenting opn]). The public's right to be secure against unreasonable searches and seizures must be jealously guarded. However, we should not impose upon those charged with the responsibility to enforce our laws an unworkable and unrealistic protocol for their actions. Contrary to the majority's interpretation, *People v Martinez* (80 NY2d 444), decided by the

Court on December 16, 1992, when analyzed in light of its facts and in the light of the relevant decisions leading to it, supports the conclusions reached herein concerning the legality of police pursuit. Far from advocating "the seizure of a person, simply because that person asserts his or her undoubted right to be left alone", this "dissenter" seeks to apply the law "as it is" and to acknowledge the practical reality faced by those who must enforce it. It appears that the majority's "judicial preference" is to apply the law as it might be if that reality were ignored.

The facts in this case are not at all unusual. At approximately 2:30 A.M. on December 1, 1990, two police officers on patrol in the Grand Concourse area of the Bronx received a radio report of a large group fighting at 1411 Grand Concourse. The report stated that one of the individuals possessed a knife. The description in the radio run was that one of the individuals in the group was wearing a red jacket and another was wearing a blue jacket with a white stripe. The officers went to the location and, approximately five seconds after their arrival, received another report that an officer required assistance two blocks away. They went to the officer in trouble, spent two or three minutes at that location and then returned to the location of the alleged altercation. Upon returning to the first location, the officers saw the defendant, who was wearing a jacket with light brown sleeves, standing with two other men. Shortly after the officers exited their vehicle, but before they said anything to the three men, the defendant ran. The two men standing with the defendant remained stationary.

The officers pursued the defendant as he ran north on the Grand Concourse to 171st Street, then west on 171st Street to Wythe Place, then north on Wythe Place to 172nd Street. At the corner of 172nd Street and Wythe Place the defendant reached into his waistband, removed a gun, and threw it beneath a parked car. The defendant continued running west on 172nd Street to Walton Avenue, where he stopped and stood leaning against a building as other officers blocked his escape.

The majority agrees with Criminal Term's determination that the officers' initial approach to the defendant was "without justification" since "[t]he officers had no reason to believe that any criminal activity was afoot and, at most, had only a right to inquire." (153 Misc 2d 366, 369.) Criminal Term concluded that therefore there was no basis for the pursuit of

the defendant and that defendant's discard of the weapon was a "spontaneous reaction" to an unlawful police pursuit *(supra, at 369)*. The court then *sua sponte* addressed the question of whether the United States Supreme Court decision in *California v Hodari D.* (499 US 621, 111 S Ct 1547, 113 L Ed 2d 690), in which the Court held that pursuit is not a seizure within the meaning of the Federal Constitution, has any significant impact on the law of this State. Criminal Term concluded that it did not, stating that *People v Howard (supra)* makes clear that the protection afforded to individuals against involuntary police intrusions "does not depend on the Federal Constitution" *(supra, at 371)*. I do not agree with the reasoning used by Criminal Term to invalidate the police pursuit in this case. For the reasons set forth herein, I find the police pursuit of this defendant "an appropriate response to the observations and beliefs of the officers involved" *(People v Leung, 68 NY2d 734, 736)*.

Recently in *People v Hollman* (79 NY2d 181), the Court of Appeals revisited *People v De Bour* (40 NY2d 210), the case in which the Court set out a four-tiered method for evaluating encounters initiated by police officers in their criminal law enforcement capacity. At the end of the *Hollman* decision the Court analyzed the significance of *California v Hodari D. (supra)*. The Court noted that in the years since *De Bour* became the law in this State, the United States Supreme Court has held that approaches, which do not amount to seizures, are not entitled to protection under the Fourth Amendment. It accurately characterized the Supreme Court's test as stated in *California v Hodari D. (supra)* and *Florida v Bostick* (501 US —, 111 S Ct 2382) as whether a reasonable person would feel free to disregard the police and go about his or her business; i.e., "[i]f the civilian would feel free to go, 'the encounter is consensual and * * * will not trigger Fourth Amendment scrutiny unless it loses its consensual nature' " *(People v Hollman, supra, at 195)*. The Court then stated: "The continued vitality of *De Bour*, therefore, is not contingent upon the interpretation that the Supreme Court gives the Fourth Amendment, because *De Bour* is largely based upon considerations of reasonableness and sound State policy. We still believe that police encounters that are not seizures or arrests for constitutional purposes should be evaluated under the *De Bour* test. The interests in privacy and security that led us to adopt that test as a matter of State common law are no less vital today." *(People v Hollman, supra, at 195-196.)*

The Court's reaffirmance of this State's protection of its citizens' privacy and security interests, under the general principles enunciated in *De Bour (supra)* was enlightening. The clarification of the terms "request for- information" and the "common-law right of inquiry" was found to be necessary by the Court, "[b]ecause the two terms on their face are so close in meaning, the legal significance [the Court] intended each to have has become obscured. The result has been inconsistency in the evaluation of markedly similar police encounters" *(supra,* at 185). While the Court in *People v Hollman (supra)* may have addressed the confusion in one area, confusion is conspicuously evident in another area to which the *De Bour* analysis is applied, namely, the scrutiny of police encounters involving police pursuit of an individual who flees upon a police officer's nonthreatening and justified approach.

The *De Bour* analysis, as restated in *People v Hollman (supra,* at 184-185), is as follows: "If a police officer seeks simply to request information from an individual, that request must be supported by an objective, credible reason, not necessarily indicative of criminality. The common-law right of inquiry, a wholly separate level of contact, is 'activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion' *(People v De Bour, supra,* at 223). Where a police officer has reasonable suspicion that a particular person was involved in a felony or misdemeanor, the officer is authorized to forcibly stop and detain that person. Finally, where the officer has probable cause to believe that a person has committed a crime, an arrest is authorized."

The Court generally defined the difference between a request for information and a common-law inquiry stating: "a request for information involves basic, nonthreatening questions regarding, for instance, identity, address or destination. As we stated in *De Bour,* these questions need be supported only by an objective credible reason not necessarily indicative of criminality. Once the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is no longer merely seeking information. This has become a common-law inquiry that must be supported by a founded suspicion that criminality is afoot." *(Supra,* at 185.)

The Court went on to demonstrate, by example, the nature

of a mere request for information as opposed to the more intrusive common-law inquiry. The Court recognized however that "the tone of police-initiated encounters with civilians can be subtle and ever-shifting, that words and gestures are susceptible to many varying interpretations, and that suspicion can grow based on intangibles evident only to the eyes of a trained police officer." (79 NY2d, *supra,* at 191.) However, the Court stated that despite its sensitivity to the rapidity with which suspicion can escalate in a street encounter, it must place limits on the power of police to pick out individuals and subject them to invasive questioning. Ultimately, the Court stated that the difference it pointed out was "a subtle one" and that it did not purport to "set out a bright line test" *(supra,* at 192) for distinguishing between a request for information and a common-law inquiry as these determinations can only be made on a case-by-case basis.

The Bench and Bar have debated the differences between an objective credible reason, a founded suspicion and a reasonable suspicion ad infinitum. Consistent application of these principles, which in common usage are nearly identical in meaning, eludes attorneys and Judges. Accordingly, it is unreasonable to expect a police officer, involved in a rapidly unfolding street encounter, to adjust his reactions according to the *De Bour* system. The Court of Appeals stated as much in *People v Hollman (supra,* at 191-192).

What should be expected of the officer involved in such an encounter is that he or she act reasonably according to the more general considerations stated in *De Bour (supra).* Rather than attempt to analyze every step taken or word said by the officer, we should instead judge these encounters according to "whether or not the police action was justified in its inception and * * * whether or not the action was reasonably related in scope to the circumstances which rendered its initiation permissible" *(People v De Bour,* 40 NY2d 210, 215, *supra).* It has been stated by the Court that " '[t]he privacy interest of our citizens is far too cherished a right to be entrusted to the discretion of the officer in the field' " *(People v Howard,* 50 NY2d 583, 588, *supra,* quoting *People v Belton,* 50 NY2d 447, 450). This writer certainly agrees. However, investigation and prevention of crime necessarily involves some invasion of a citizen's privacy, sometimes minimal, and sometimes total. It is naive to think that we do not to some degree entrust our privacy to the discretion of police officers by the very nature of their job. We must therefore provide law enforcement

personnel with a clear and workable standard, so that the officers can perform professionally and the privacy interests of our citizens can be properly safeguarded.

The majority accuses this "dissenter" of failing to appreciate "that there is a fundamental difference between the right of an officer to inquire and the right of an officer to pursue and seize". While I know and "appreciate" the difference between an "objective credible reason" and a "reasonable suspicion" as formulated by the Courts, the analysis which follows shows that in numerous cases that fundamental difference has been obscured through the interchangeable use of these terms. Even the phrase "right to inquire" is subject to interpretation; e.g., does the majority, when speaking of the right of an officer to inquire, mean "request for information" or "common-law right of inquiry"? *(People v Hollman, supra.)*

It is apparent that the majority fails to appreciate that in the type of street encounters here at issue the levels of suspicion can legitimately escalate through the entire *De Bour* range in a matter of moments. It is worth remembering that our determinations in this area of the law are meant as much to guide officers in the field as to guide prosecutors, defense attorneys and Trial Judges. Fundamentally we are instructing law enforcement personnel on what they can and cannot do. We must do so clearly and unambiguously.

Police-initiated encounters, such as the one at issue, in which flight and the discard of a weapon or other contraband is involved, have been the subject of particularly inconsistent analysis since *People v Howard* (50 NY2d 583, *supra).* A review of *People v Howard (supra)* and its progeny will illustrate the current confusion spoken of *supra,* and the need to employ the broader principles of *De Bour (supra), People v Leung (supra),* and *People v Martinez (supra).*

*People v Howard (supra)* is perhaps the case most relied upon to invalidate police pursuit of a fleeing individual and to thereby uphold suppression of contraband which is either discarded or recovered from the fleeing individual's person. There two officers in plain clothes on motor patrol in a high-crime area, observed the defendant at about 1:00 P.M. carrying what appeared to the officers to be a woman's vanity case. As the officers passed the defendant, he looked over his shoulder at them. The defendant looked two or three more times in the direction of the car and when the officers' vehicle pulled to the side of the street the defendant reversed direction. The officers

made a U-turn and followed the defendant whose pace quickened. When the officers' car was parallel with the defendant, one of the officers displayed his shield, identified himself and said: "Police Officer. I would like to speak with you". The defendant ignored them and continued walking. The officers followed and again identified themselves and asked the defendant to stop. When the officers began to get out of the car the defendant clutched the vanity case against his chest and started to run. The officers pursued and were joined in the pursuit by a college student. The defendant ran over a fence, through an alleyway and into the basement of a building at which point, pursued by the college student, he threw the vanity case into a pile of rubbish. The student restrained the defendant until the officers arrived. When the officers entered the basement, the student called their attention to the vanity case. The officers immediately opened it and found a .38 caliber revolver and heroin in glassine envelopes. The defendant was then placed under arrest.

The Court of Appeals reversed the Appellate Division and granted suppression of the physical evidence. It found that the initial request for information by the officers was justified, based on the defendant's numerous glances and changes of direction, the fact that the officers were in an area with a high burglary rate and the fact that it was not unusual for a burglar to carry away stolen property in the victim's luggage (People v Howard, supra, at 589). However, the Court concluded that there was no basis for the officers' pursuit of the defendant. The Court relied on the rule, based on the Fifth Amendment to the United States Constitution, that an individual has an absolute right to refuse to answer inquiries made of him or her by law enforcement personnel (supra, at 590-591). However, the Court found that the failure to stop or cooperate, by identifying oneself or answering questions, could not be the predicate for an arrest or even pursuit by police absent other circumstances constituting probable cause. The Court's holding was stated as follows: "An individual to whom a police officer addresses a question has a constitutional right not to respond. He may remain silent or walk or run away. His refusal to answer is not a crime. Though the police officer may endeavor to complete the interrogation, he may not pursue, absent probable cause to believe that the individual has committed, is committing, or is about to commit a crime, seize or search the individual or his possessions, even though he ran away." (50 NY2d, supra, at 586.)

The Court stated also that its holding: "[did] not mean that the police in furtherance of their duties may not continue observation provided that they do so unobstrusively and do not limit defendant's freedom of movement by so doing. Defendant's flight, had there also been indicia of criminal activity, would have been an important factor in determining *probable cause* [citations omitted], but where, as here, there is nothing to establish that a crime has been or is being committed, flight, like refusal to answer, is an insufficient basis for seizure or for the limited detention that is involved in pursuit [citations omitted]". *(People v Howard, supra,* at 592 [emphasis added].) With respect to the issue of whether the defendant in *Howard (supra)* abandoned the vanity case so as to waive his privacy interest in it, the Court found that the defendant's act of throwing or dropping the vanity case was a "spontaneous reaction" to the necessity of evading pursuers and that therefore the search of the case was invalid *(supra,* at 593; *see generally, People v Boodle,* 47 NY2d 398, *cert denied* 444 US 969).

In contrast to *De Bour (supra)* and *Hollman (supra), People v Howard (supra)* was a 4 to 3 decision, with Judge Jasen writing the dissent in which Judge Gabrielli and Judge Wachtler, the author of the opinion in *People v De Bour (supra),* concurred. Judge Jasen implicitly stated that much less than probable cause is needed to justify the pursuit of a fleeing individual. He characterized the majority decision as "another serious and unjustifiable blow to effective law enforcement" and described the officers' pursuit as "most reasonable" given the defendant's suspicious actions prior to the officers exiting their car (50 NY2d, *supra,* at 594). It was stated in the dissent that the majority's holding, that officers, when faced with defendant Howard's actions, "could do no more than follow defendant to observe him from a distance * * * borders on the absurd" (50 NY2d, *supra,* at 595). The dissent's reasoning was based on the premise that while "[i]t is true that flight from police, in and of itself, would not constitute a sufficient basis for arrest * * * it is equally as true that the defendant's flight is an important factor to be considered when determining whether probable cause existed" *(supra,* at 595, citing *Sibron v New York,* 392 US 40; *People v Kreichman,* 37 NY2d 693; *People v Schneider,* 58 AD2d 817).

In *People v Leung* (68 NY2d 734, *supra),* decided in 1986, six years after *People v Howard (supra),* the Court sustained the

denial of suppression of physical evidence discarded by the defendant as he fled from pursuing officers. The memorandum decision employed the broader principles of *De Bour (supra)* to conclude that a reasonable suspicion of criminality, and not probable cause, is required for pursuit. In *Leung (supra)*, plainclothes police officers in an unmarked car saw the defendant pass a three-inch-by-five-inch brown envelope to a companion. The envelope was described by the officers as the type commonly used in the drug trade. When the officers approached the defendant and identified themselves the defendant immediately fled. As he ran he discarded a hat and then threw a black object, later found to be a loaded operable nine-millimeter pistol, under some bushes.

The Court concluded in *Leung*, that the "level of police intrusion was an appropriate response to the observations and beliefs of the officers involved" (68 NY2d, *supra*, at 736). The passing of the small brown envelope which appeared to the officers to be a "three dollar bag" of drugs in an area known for its drug activity was found to be "at the least" an " 'objective credible reason' " for the police officer's approach *(supra, at 736)*. "When coupled with defendant's immediate flight upon the officer's approach, the passing of the manila envelope * * * establishe[d] the necessary reasonable suspicion that defendant had committed, or was about to commit a crime, such that pursuit by the officers was justified" *(supra, at 736)*. No mention was made in *Leung* of pursuit as limited detention or arrest. More significant, however, is the fact that the Court did not dissect the police officers' actions down to the minutest detail.

An attempt to synthesize *People v Leung (supra)* with *People v Howard (supra)* fails to yield a logical rule. In both, the officers were found to have sufficient reason to approach the defendant. However, in *Howard*, defendant's flight was not viewed as a contributing factor forming the basis for a higher level of intrusion on the part of the officers. In *Leung (supra)*, however, the defendant's flight was found to be perhaps the main contributing factor which justified the pursuit.

Since *People v Leung (supra)*, the Court, without significant comment, has sustained the denial of suppression in situations where under the *Howard* rationale suppression would certainly have been granted. In *People v Jones* (118 AD2d 86, *affd* 69 NY2d 853), two officers on patrol in the early morning hours received a radio report of two Hispanic males stripping a car in front of 600 Baychester Avenue, in the Bronx. They

arrived on the scene and observed the defendant, who did not match any description received by the officers, running. Seeing two other men nearby and thinking that defendant might be the victim of a crime, the officers called to the defendant who stopped momentarily, looked at the officers and then ran away. The police pursued and as the defendant ran he discarded a skirt. The police compelled the defendant to stop with one of the officers threatening the use of his nightstick and the other drawing his gun. The officers asked the defendant why he ran and asked about the skirt which defendant discarded and one of the officers had retrieved. The defendant denied both running and discarding the skirt and then gave his name and nearby address. After the police verified the information, they released him.

The defendant was arrested subsequently, after the two officers who initially confronted him overheard another officer talking to the victim of an assault and robbery at 600 Baychester Avenue. The victim described the defendant and placed him at the scene near the same time the officers encountered him. The trial court granted the defendant's omnibus motion insofar as to suppress the skirt recovered by the officers, but denied suppression of all of the incriminating statements defendant made to the police in response to their initial inquiry.

This Court, in affirming the conviction in its entirety, found that the initial approach and request by the officer for defendant to stop were supported by an "objective, credible reason", i.e., the belief that defendant might have been the victim of a crime (supra, at 92). It was further concluded that the defendant's actions of increasing the speed of his run and disposing of the object he was carrying, provided the officers with a heightened level of suspicion which justified their pursuit, detention and questioning (118 AD2d, supra, at 92). This Court also found that the skirt having been dropped as soon as the police requested him to stop was not abandoned in reaction to the police officers' actions and could have been admitted (supra).

The Court of Appeals (69 NY2d 853, 854-855, supra) affirmed this Court's decision in People v Jones (118 AD2d 86, supra), stating with regard to suppression that: "The courts below found on this evidence that the police had an articulable reason for their initial attempt to talk with defendant and reasonable suspicion justifying their detention while they questioned him (see, People v Leung, 68 NY2d 734; cf., People v

*Howard,* 50 NY2d 583)." The Court in this case held only that a reasonable suspicion was present and that the findings of the court below on the subject were significant.

Until very recently we were left it seems with *Howard (supra), Leung (supra)* and a subsequent collection of recent Appellate Division cases, which demonstrate that consistent application of the *De Bour* four-tier analysis to similar police-civilian encounters involving flight continues to elude us. The following discussion includes just a few of those cases.

In *People v Sloan* (178 AD2d 624, *lv denied* 79 NY2d 953), a case similar to the one at bar, the Second Department unanimously affirmed the Supreme Court's denial of suppression of a gun discarded by the defendant during his flight from the police. There police officers in plainclothes heard a gunshot at about 1:00 A.M. and drove toward the location from which they thought the shot emanated. The officers asked passersby they encountered, if they heard the shot. These individuals directed the police officers' attention to a group of about five men standing nearby. As one of the officers exited the car and said " 'Hey guys' " the defendant immediately fled *(supra,* at 625). During the pursuit the defendant threw a handgun into the front yard of a house. The defendant was apprehended and the weapon recovered.

The Appellate Division, Second Department, held that "[t]he sound of a gunshot, information from civilians that the shot had come from the direction of the defendant, and the defendant's immediate flight from the approaching officer gave rise to a reasonable suspicion sufficient to justify the police to pursue and to stop and detain the defendant *(see,* CPL 140.50 [1]; *People v Leung,* 68 NY2d 734; *People v De Bour,* 40 NY2d 210; *People v Wider,* 172 AD2d 573 [other citations omitted])" *(supra,* at 625). The Court found also that the gun, which was abandoned by the defendant while he was being pursued, was properly seized, as its abandonment and recovery were not the result of unlawful police action (178 AD2d, *supra,* at 625).

In *People v Reid* (173 AD2d 870, *lv denied* 78 NY2d 972), the Second Department unanimously affirmed the denial of suppression in a case where police officers on patrol seeking a known individual who had been involved in a shooting approached the defendant because " 'he look[ed] like the guy' ". When the officers asked the defendant to approach their car, he asked what the officers wanted and then ran away. As he ran, the defendant reached toward his waistband and threw a

handgun into a vacant lot. The Second Department found that "[t]he stop of the defendant was proper as it was supported by an 'articulable reason', the defendant's strong resemblance to the known shooter they were seeking *(People v Leung,* 68 NY2d 734; *People v De Bour,* 40 NY2d 210 [other citations omitted])" *(supra).*

These two cases demonstrate the application of two different standards to allow pursuit (i.e., reasonable suspicion and an articulable reason) by the same Court.

In *People v Elliot* (162 AD2d 609, *lv denied* 76 NY2d 856), the police were canvassing a housing project for a robbery suspect when they saw the defendant walking along a chain-link fence adjacent to a playground. When the defendant saw the police car he changed direction, quickened his pace and continued to look back at the patrol car as he walked. Although the defendant did not match the description of the perpetrator the officers were seeking, these officers, like the officers in *People v Howard (supra),* were suspicious of the defendant because of his furtive movements. The officers asked the defendant to approach the patrol car. From a distance of about 60 or 70 feet away the defendant said he had done nothing wrong and, when one of the officers began to exit the car, the defendant started to run. Without looking back at the officers the defendant ran to a shed in the playground, crouched down and hid a silver object, later found to be a handgun, in the doorjamb of the shed. The defendant was apprehended and the gun recovered.

In *Elliot (supra),* the Second Department cited *People v Howard (supra)* and *People v Leung (supra)* and stated that pursuit of an individual approached for an investigatory inquiry is justified only upon a reasonable suspicion that a crime has been or will be committed. In apparent reliance only on *Howard (supra),* the Court concluded that because the officers had not observed any criminal activity, the pursuit of the defendant premised on furtive behavior and flight was unjustified and unlawful (162 AD2d, *supra,* at 610). The Court, however, affirmed the denial of suppression finding, based on *People v Boodle* (47 NY2d 398, *supra),* that the defendant's discard of the weapon was not a spontaneous reaction to the unlawful pursuit, but was sufficiently removed from the pursuit to be an independent act involving a calculated risk.

The defendant's flight in *People v Elliot (supra)* creates no lesser level of suspicion than the behavior relied upon by the

police to pursue the defendants in *People v Sloan (supra* [bystanders told police that the sound of a gunshot came from the general direction of defendant who was standing in a group of five men]) and *People v Reid (supra* [police pursued defendant who ran because he looked like a known shooter]). In those cases the police pursuit was found to be justified, yet in *People v Elliot (supra),* the pursuit was found to be unjustified.

This Court is not immune from the inconsistent application of *De Bour (supra), Howard (supra),* and *Leung (supra),* in flight cases. In *People v Spicer* (172 AD2d 300, *lv denied* 78 NY2d 975), uniformed officers responded to a radio run of a man stripping a van. When the officers arrived at the location they saw the defendant, who matched the description received, on an otherwise deserted street, standing near the van. When the officers attempted to question him, he ran. During the flight he turned toward the officers and discarded a gun. This Court held that "[t]heir pursuit was warranted, given the accuracy of the radioed description, the officers' on-the-scene observations, and the defendant's immediate flight" (172 AD2d 300, *supra).*

*People v Spicer (supra)* is contrary to *People v Rodriguez* (178 AD2d 381). There the arresting officer in a marked car received a radio call that four men were selling drugs on a specific street corner, one of whom was described as a male Hispanic wearing a blue cut-off tee-shirt with the words " 'Portland Maine' " written on the back. The officer arrived at the designated location and saw the defendant standing there wearing the tee-shirt described in the radio call. When the officer called out " 'hey buddy' " the defendant turned, looked at the officer and immediately ran. During the pursuit the defendant discarded 15 vials of crack wrapped in brown masking tape. This Court affirmed the suppression of the discarded drugs. It was stated that "[t]he People did not establish either the reliability of the anonymous information or additional indicia of criminality pointing to defendant as having committed a crime. The information anonymously conveyed here was not ' "so specific and congruous" ' with that which was actually encountered by the arresting officer as to have made the reliability of the tip apparent and justified the pursuit [citations omitted]" (178 AD2d 381, *supra).* In both *People v Spicer (supra)* and *People v Rodriguez (supra),* the police officers had radio calls giving specific descriptions

and exact locations, yet in one case the pursuit was found to have been justified and in the other it was not.

In *People v Jones (supra)*, we found the pursuit of the defendant justified because he was running near the location of a reported crime and continued running when the police attempted to inquire, despite the fact that the individual did not match the description of the alleged perpetrators.

In *People v Rivera* (175 AD2d 78, 79, *lv denied* 78 NY2d 1129), this Court apparently concluded that a "founded suspicion" justified pursuit and attempted to reconcile *Howard (supra), Leung (supra),* and *People v Jones (supra).* There the suppression court found that the officers could not have observed the exchange of money or glassine envelopes but could only have seen " 'hand motions' " and "interaction" between the defendant and another man, before they approached the two whereupon the defendant and the other individual fled in different directions *(supra,* at 79). This Court stated: "This simple approach upon a founded suspicion of criminal activity was justified in its inception and reasonably related in scope to the circumstances, rendering it permissible *(People v De Bour,* 40 NY2d 210, 215). The officer, on his initial approach, did not display his shield, take out his weapon or otherwise identify himself as a policeman. Any intrusion on defendant's liberty therefore was minimal and justified by the initial, suspicious behavior *(see, People v Balanco,* 158 AD2d 367). Defendant's flight (and the flight of his cohort) upon seeing the officer approach, coupled with the officer's objective credible reason for his initial minimal action justified an increased level of police intrusion—i.e., pursuit by the officer *(see, People v Leung,* 68 NY2d 734, 736)." (175 AD2d, *supra,* at 79-80.)

Thus, this Court, in one memorandum concluded that the officer had a founded suspicion to initially approach the defendant, and then concluded that an objective credible reason plus the defendant's flight and the flight of the defendant's cohort justified the pursuit. The Court then stated: *"People v Howard* (50 NY2d 583), cited by defendant in support of his position, is inapposite. There, the Court of Appeals held flight, with nothing more, was not a sufficient basis for finding probable cause but that flight combined with other indicia of criminal activity would justify pursuit *(see, People v Leung, supra).* Indeed, in *People v Jones* (118 AD2d 86, 92, *affd* 69 NY2d 853), the mere sight of an individual running, by police investigating another crime, which person

they believed might be the victim of a crime, was found to constitute an objective, credible predicate for an approach seeking information and for pursuit." (175 AD2d, *supra,* at 80.)

One very recent decision by this Court demonstrates the impractical result this Court was compelled to reach as a result of its attempt at coherent application of *People v Howard (supra)* to a police-civilian encounter involving flight. In *People v Holmes* (181 AD2d 27, *supra),* uniformed police observed several men gathered near a known drug location. The police knew that some of these individuals had been arrested at the same location for drug-related offenses. The officers saw that the defendant had an unidentified bulge in the right pocket of his long leather jacket. As the patrol car approached, the defendant began to split off from the group and eventually turned and walked away. The officers stopped the car and attempted to question the defendant from inside their vehicle. The defendant at first approached the patrol car but when one of the officers began to exit the car he ran. The defendant was apprehended after a chase during which he threw a plastic bag into a courtyard. The bag was recovered and found to contain 45 vials of crack. This Court reversed the trial court's denial of suppression and, finding that in this State the "principles enunciated in *People v Howard (supra),* still govern the propriety of police intrusions, including pursuit", held: "that at the time the pursuit here commenced, the officers, at most, had an objective credible reason, not necessarily indicative of criminality, which permitted them to approach defendant and request information. This factual predicate must be distinguished from one in which, before the defendant flees, the police are already in possession of a founded suspicion that criminality is afoot. In the latter case, the additional implication of guilt provided by the defendant's flight has generally been held sufficient to enhance the predicate to the reasonable suspicion necessary to justify a chase *(see, e.g., People v Leung,* 68 NY2d 734, *supra; People v Rivera,* 175 AD2d 78, *lv denied* 78 NY2d 1129; *People v Allen,* 141 AD2d 405, *affd* 73 NY2d 378)." (181 AD2d, *supra,* at 30-31.)

Apparently the Court of Appeals discerns little significant difference between an "objective credible reason" and a "founded suspicion" *(People v Hollman, supra,* at 185). While the Court of Appeals in *People v Hollman (supra)* stated that precision in judicial review is best served by applying the *De Bour* analysis strictly, the lower courts of this State have, not for want of trying, been unable to do so and at the same

time achieve consistent results. The above analysis of only a few of the numerous reported cases in this area, indicates that strict application of *De Bour (supra)* to encounters involving flight, even with the guidance of *People v Hollman (supra)*, has yielded inconsistent and perhaps fundamentally unfair results.

In the cases cited *supra*, we find the following terms being used: right to inquire, justified approach, spontaneous reaction to an unlawful police pursuit, consensual encounter, common-law right of inquiry, request for information, objective credible reason, a founded suspicion, reasonable suspicion, pursuit as a limited detention, heightened level of suspicion, and articulable reason. Not infrequently, cases with very similar fact patterns result in contrary conclusions, depending on which of the aforementioned terms the particular court applies to the police approach to an individual, in order to support the desired result.

In some cases an individual's flight has been held to justify pursuit, and therefore to constitute a reasonable suspicion, when coupled with only an objective credible reason for the officer's approach *(see, People v Reid, supra; People v Rivera, supra; People v Jones, supra; People v Easton,* 182 AD2d 456). In other cases more overt indications of criminality are required before an officer can act *(see, People v Holmes, supra; People v Rodriguez, supra; People v Mitchell,* 185 AD2d 163, *supra)*.

In this case, and cases like it where an officer has a justifiable, and thereby I mean articulable and credible, reason for approaching a civilian to request information, investigate the report of a crime or investigate suspicious behavior, the civilian's flight in the face of a nonthreatening approach by a police officer is the escalating factor which justifies the officer's pursuit. When during the pursuit the individual discards a weapon or other material recognized by the officer as contraband, the officer is then dutybound to apprehend that individual. The conclusion reached in *People v Howard (supra)* and its progeny, that such pursuit should not be allowed, simply ignores the reality of these rapidly escalating street encounters.

*People v Martinez (supra)* construed by the majority to support its view of this case is not to the contrary. There the Court recognized that the courts have applied the rules applicable to police pursuit "somewhat unevenly * * * because of

language found in *People v Howard* (50 NY2d, 583, *supra*)."
(80 NY2d, *supra,* at 447.) The facts of *Martinez (supra),* con-
spicuously absent from the majority's consideration, are as
follows.

Two Mount Vernon city police officers in plain clothes
traveling in a marked police car in a high-crime area, saw the
defendant remove a Hide-a-Key box from the steel grate of a
store window. The officers knew from their experience that
Hide-a-Key boxes were sometimes used by drug dealers to hide
drugs. After observing the defendant the officers stopped and
got out of their car with one of them prominently displaying
his badge. In addition, there was evidence that the defendant
knew one of the officers, because defendant was present when
the officer arrested one of his companions. At the officers'
approach defendant ran into a nearby grocery store. The
officers chased the defendant into the store, saw him pass the
box to his codefendant, and saw the codefendant go to the rear
of the store and throw the box to the floor. The box was
retrieved and found to contain 17 vials of what later proved to
be crack cocaine. The Court found the officers' pursuit of the
defendant justified and denial of suppression proper, as fol-
lows:

"Though some have interpreted *People v Howard* otherwise,
the rule is, and was before the *Howard* decision, that the
objective evidence necessary to support a stop and seizure
short of an arrest is reasonable suspicion *(People v De Bour,
supra; People v Leung, supra).*

"Reasonable suspicion represents that 'quantum of knowl-
edge sufficient to induce an ordinarily prudent and cautious
[person] under the circumstances to believe criminal activity
is at hand' *(see, People v Cantor,* 36 NY2d 106, 112-113).
Because the determination that reasonable suspicion existed
involves mixed questions of law and fact, we are bound by the
findings of the courts below if there is evidence in the record
to support them *(see, People v Jones,* 69 NY2d 853, 855).

"In the case before us, there is support in the record for the
finding below that the police officers had a reasonable suspi-
cion of criminal activity to justify their pursuit of defendant.
There was evidence that defendant was seen standing at night
in an area known for an excessive amount of drug activity, he
was removing a device known to the officers to be used for
hiding drug stashes, and he fled immediately upon observing
the approaching police. Defendant had a right to refuse to

respond to a police inquiry and his flight when the officers approached could not, in and of itself, create a reasonable suspicion of criminal activity (see, People v May, 81 NY2d 725, supra [decided today]). However, defendant's flight may be considered in conjunction with other attendant circumstances, namely, the time, the location, and the fact that defendant was seen removing an instrument known to the police to be used in concealing drugs. 'When coupled with defendant's immediate flight upon the officer's approach, the [removal of the Hide-a-Key box] in this narcotics-prone neighborhood establishes the necessary reasonable suspicion * * * such that pursuit by the officers was justified' (see, People v Leung, 68 NY2d, at 736, supra).

"Inasmuch as the pursuit of defendant was justified, his abandonment of the Hide-a-Key box was not precipitated by any illegal police conduct (see, People v Leung, 68 NY2d, at 736-737, supra; cf., People v Boodle, 47 NY2d 398, 402, cert denied 444 US 969). Once defendant abandoned the box, he lost his right to object to the opening of the box and the drugs discovered upon opening the box provided the police with probable cause to arrest him. Thus, defendant's motion to suppress evidence was properly denied." (80 NY2d, supra, at 448-449.)

While the majority focuses on the Court's acknowledgment of the defendant's right not to respond to police inquiry, and its reiteration that flight in and of itself does not create a "reasonable suspicion", the focus of the decision, taken in the context of the facts of Martinez (supra), is upon the attendant factors which justified the officers' pursuit.

The Court expressly held that the "defendant's flight may be considered in conjunction with other attendant circumstances, namely, the time, the location, and the fact that defendant was seen removing an instrument known to police to be used in concealing drugs" (supra, at 448). The majority ignores these attendant factors in its evaluation of the case at bar. It should be remembered that this was not a situation in which the officers had no reason to be where they were and singled out defendant on a whim. The officers were investigating the report of a crime, at 2:30 A.M., at the precise location where the crime was to have occurred. The officers were carrying out their duty to investigate the report when they approached the defendant; they were not as the majority suggests just satisfying a "mere curiosity" as to defendant's purpose for being at the location. Moreover, even if the officers

were seeking merely to ascertain defendant's identity and purpose for being at the location, such inquiry would not necessarily have been improper *(see, People v Diaz,* 80 NY2d 950).

In *People v Diaz (supra,* at 952), the Court of Appeals affirmed the denial of suppression as follows: "Trained narcotics officers driving through a drug-prone neighborhood spotted defendant clutching a plastic bag tightly against his body. These circumstances, although not necessarily indicative of criminality, justified the officers' initial approach for the purposes of asking defendant to identify himself and state his purpose in the neighborhood *(see, People v De Bour,* 40 NY2d 210).* That one officer held his hand on his holstered gun as he approached the defendant was not, by itself, sufficient to raise the encounter to a second-level investigatory stop under *De Bour,* and defendant intentionally abandoned the plastic bag and fled before the officers had any opportunity to ask him any questions."

The Court's memorandum is significant in that therein the Court approves of an approach which would probably have been disapproved under *People v Howard (supra)* and concludes that an officer's conspicuous placement of his hand on his weapon did not raise the level of intrusion so as to require any additional indication of criminality to justify the approach.

I agree with the majority that in the absence of any attendant circumstances, flight in and of itself would not create a reasonable suspicion of criminal activity *(People v Martinez, supra,* at 448). However, in the case at bar given the report, the time, the location and the fact that defendant's companions did not run, one cannot help but conclude that the pursuit was justified.

The majority seeks to characterize the police action herein as a completely unwarranted and extreme invasion of this defendant's fundamental constitutional right not to respond to police inquiry. That characterization ignores much, especially the fact that during the chase the defendant discarded a handgun. As the Court stated in *People v Martinez (supra,* at 448), reasonable suspicion represents that " 'quantum of knowledge sufficient to induce an ordinarily prudent and cautious [person] under the circumstances to believe criminal activity is at hand'." Should an ordinarily prudent person charged with the duty to investigate the report of a crime,

under the circumstances herein, not pursue an individual who may be involved with the reported crime and who runs at the mere sight of the police officers' approach? Moreover, should that same person so charged not continue the pursuit and apprehend the fleeing individual, when that individual discards a weapon? The answer to both questions should be no. This was not, as the majority characterizes it, a case where the defendant's "response" to the officers' inquiry was not forthcoming. Here the defendant fled at the nonthreatening and justified approach by the officers before any inquiry took place.

Given all of the circumstances, it is clear to this writer that in this case the police action was justified in its inception, and that the level of police intrusion was permissible. While I totally concur with the majority's general concern for "personal privacy" and the "meaningful limitation on the coercive power of the State", their determination in this case succeeds only in improperly limiting the ability of law enforcement personnel to perform the duties with which they are charged.

Accordingly, I would reverse the trial court's decision and deny suppression.

CARRO and ROSENBERGER, JJ., concur with MURPHY, P. J.; ROSS and KASSAL, JJ., dissent in a separate opinion by ROSS, J.

Order of the Supreme Court, Bronx County, entered February 7, 1992, granting the defendant's motion to suppress physical evidence, is affirmed.